Filed 1/12/23 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>                    v.<br><br>BRANDON RIO SHERMAN,<br><br>    Defendant and Appellant. | A162766<br><br>(San Mateo County Super. Ct. No. 18NF013014A)<br><br>**ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT** |

It is ordered that the opinion filed herein on December 15, 2022, be modified as follows:

On page 10, in the first full paragraph, at the beginning of the fourth sentence, delete the first word, "Specifically" and insert in its place the words, "Claiming to find support in *Reyes*" so that the sentence reads:

> Claiming to find support in *Reyes*, Sherman contends section 136.1, subdivision (b)(1) "applies to attempts to dissuade reports of past crimes but does not cover attempts to prevent a victim from seeking help during an ongoing crime."

There is no change in the judgment.

STREETER, Acting P. J.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

Trial Court:  Superior Court of California, County of San Mateo

Trial Judge:  Hon. Jeffrey R. Finigan

Counsel:       Cynthia M. Jones, under appointment by the Court of Appeal,
                  for Defendant and Appellant.

               Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant
                  Attorney General, Charles C. Ragland, Senior Assistant
                  Attorney General, Arlene A. Sevidal, Supervising Deputy
                  Attorney General, Randal D. Einhorn and Andrew Mestman,
                  Deputy Attorneys General for Plaintiff and Respondent.

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRANDON RIO SHERMAN,<br><br>    Defendant and Appellant. | A162766<br><br>(San Mateo County Super. Ct.<br>No. 18NF013014A) |

A jury convicted defendant Brandon Rio Sherman of kidnapping, assault by means of force likely to produce great bodily injury, and preventing or dissuading a victim or witness from reporting a crime. The trial court sentenced him to 11 years in prison. On appeal, Sherman argues (1) there was insufficient evidence to support the conviction for dissuading a victim or witness, and (2) the case must be remanded for resentencing due to a change in the law governing determinate sentencing. We reject Sherman's challenge to the dissuasion conviction, but we agree a remand for resentencing is necessary.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

1

# I. BACKGROUND

## A. *The Evidence Presented at Trial*

### 1. The Prosecution's Case

In August 2018, Fernanda Doe and her boyfriend, Cuauhtli Padilla Arias, traveled from Mexico to the Bay Area, where Padilla Arias attended a business conference. On August 14, Doe spent the day shopping while Padilla Arias was at the conference. They planned to meet at the end of the day after Doe took an Uber back to their hotel. At some point, Doe texted Padilla Arias stating the battery on her phone was low and, after Doe shared her location, Arias requested an Uber on Doe's behalf.

A car with Uber and Lyft stickers arrived in the parking lot where Doe was waiting. The driver, identified as Sherman, stopped, rolled down a window, and asked if she was "Cuau," which was her boyfriend's nickname. Sherman had previously worked as a driver for Uber, but his account had been deactivated in June 2018 (two months before the incident at issue here).

After Doe got into the back seat of the car, Sherman told her that she was "very good-looking." He asked Doe where she was going, and she told him the name of her hotel and showed him the hotel key card, which he took from her. Doe asked Sherman if he had a phone charger because her phone had died. Sherman took her phone and placed it on the front passenger seat.

As he drove, Sherman continued to tell Doe that she was good-looking. Sherman said he was 39 years old and was working and studying either engineering or computer science. He began driving toward mountains and a lake, which Doe found strange because she had not seen the mountains and lake that morning. Using her iPad, Doe took a photograph of the mountains and lake.

2

Doe asked Sherman for her phone, but he kept driving. He pulled the car over, removed his belt, "lunged" into the back seat, and got on top of Doe. Sherman covered Doe's mouth and put his hand on her neck like he was holding her down. He yelled at her to pull down her pants. She had difficulty breathing. Sherman grabbed her arms and legs so she could not move or open the car door. Sherman pulled down his pants and moved his boxer shorts, pulled down Doe's pants and underwear, placed her on top of him, and put his penis in her vagina for "a few minutes."

While this was happening, Doe was able to retrieve her phone from the front passenger seat. Sherman saw Doe take the phone, and he turned it off, saying " 'I'm not gonna let you have it.' "

Doe told Sherman she was pregnant. This scared Sherman, who lifted Doe's blouse and told her she was " 'too thin to be pregnant.' " Doe insisted it was true. Sherman then said he needed to take Doe somewhere " 'crowded.' " He returned to the driver's seat and began driving.

Doe had managed to hide her phone while she was telling Sherman she was pregnant. When he started driving again, she retrieved the phone, turned it on, and texted her boyfriend, telling him she needed help and to call the police. Padilla Arias told her to get out of the car and run. Sherman asked Doe where her phone was and what she was doing. She told him that he had thrown it and that she did not know where it was.

Sherman drove back toward the city, and he asked Doe for the name of the hotel again and put it into his phone, but he did not follow the route directions toward the hotel. As he drove, Doe put her clothes back on.

Sherman eventually parked in a parking lot and asked if he could move to the back seat to talk to her. Doe told him she was scared and did not want him near her. After about five minutes, Sherman began driving and parked

3

in a different parking lot.  Doe got out of the car, leaving her belongings behind, and yelled for help.  Sherman drove off.  A man stopped his car and approached Doe, asking if she was okay.  Another witness observed that Doe "looked hysterical like she had seen a ghost."  Doe stated she had been choked and said "[h]e tried to kill me."  The police were called, and they arrived at the scene and spoke to Doe.

Doe was taken to the hospital by ambulance, and a nurse practitioner performed a sexual assault examination.  She found no injuries to Doe's genital area but was unable to complete the examination because Doe was unable to tolerate it.  Some evidentiary swabs, along with Doe's clothing, were collected.  Using a mannequin head, Doe described how Sherman placed his hands on her mouth and throat.  The nurse practitioner did not find any physical injuries to Doe's head or neck.

A criminalist later observed sperm on slides prepared from the interior crotch area of Doe's underwear and on a slide prepared from Doe's vaginal swab.  DNA analysis showed Sherman was included as a contributor to the sample from the underwear.  No conclusions could be drawn from the DNA extracted from the vaginal swab due to low levels of DNA.

On the day after the incident, Doe sat with a forensic sketch artist. While she was with the artist, Doe rubbed her neck and "cringe[d]" when she took a drink.  She told police she had pain in her head, neck, arms, shoulders, and back.  Police took her back to the medical center for another medical examination.  At that examination, Doe again reported she had pain in her neck, back, shoulders, and upper arms.

Also on the day after the incident, police took Doe on a ride-along. When Doe saw places that she appeared to recognize, she became emotionally disturbed, crying and shaking.

4

Pursuant to a search warrant, police searched Sherman's home, where they found Doe's Mexican consulate identification card. Police also found Uber stickers, one of which looked as if it might have been removed from a car. Finally, officers found a black ZTE cell phone belonging to Sherman.

## 2. The Defense Case

Sherman testified that in August 2018, he was working for Enterprise Rent-A-Car and Lyft and was going to school full time. He had stopped working for Uber a few months earlier, although he had both Uber and Lyft stickers on his car. On the day of the incident, he went to school and then later worked driving for Lyft. After dropping a passenger off at the San Francisco airport, he planned to head home to San Jose after first stopping at an arts and crafts store. As he pulled into the store parking lot, a woman carrying bags ran up to his car and asked, " 'Are you my Uber driver?' "

Sherman told the woman that he was not her driver. He did not ask her whether she was "Cuau" or "Cuauhtli." Doe was "being persistent." She said her phone was dead and jumped into the back of Sherman's car. Sherman again said he was not her driver, but he said he would help her because her phone was dead. Sherman testified Doe "was like a damsel in distress." He began charging her phone for her. Doe told him she wanted to go to her hotel, but she was unsure of the name of the hotel. He tried searching for the location with Google maps.

As they drove, he and Doe conversed. She told him she was a dancer from El Salvador. Sherman testified that Doe was maintaining eye contact in the rear view mirror and was "very flirtatious." Sherman flirted back. At some point, Sherman realized they were driving in the wrong direction, but Doe saw Crystal Springs reservoir and wanted to take some photos. After Doe removed her boots and was getting comfortable in the back seat, Sherman pulled to the side of the road and asked to get in the back seat with

5

her. He was trying to "hook up" with Doe. He got into the back seat and asked Doe if he could kiss her. She said he could kiss her on the cheek. He kissed her cheek and neck. Sherman testified that Doe then took her pants off. He touched her vagina with his finger. Doe then got on top of Sherman and was "grinding" or "dry humping" him. Both of them were still wearing underwear. Sherman ejaculated into his boxers.

Sherman asked Doe if they could have sex. Doe said Sherman would have to pay her $500 to have sex with her. Sherman, who had only $200, got back behind the wheel and began driving, looking, unsuccessfully, for a bank to obtain the remainder of the money to pay Doe. He offered her some jewelry that he had in his car, some of which he had received from an aunt who had recently passed away, and some of which came from an uncle who owned a gem mine. Doe was "kind of pissed off a little bit." When he got closer to her hotel, he stopped the car to try to figure out where he needed to go. Sherman got into the back seat and again asked to have sex with Doe. At that point, Doe ran out of the car and began screaming, "He raped me! He raped me!" Sherman drove away because he did not want to get arrested, and he thought nobody would believe what had happened.

At some point, Sherman realized Doe had left some items in the back seat. He threw the items out of the car and kept driving. Later, however, he saw that she had also left her purse behind. He dropped the purse off on a curb in a nice neighborhood. Even later, Sherman found Doe's identification card under one of the seats in his car. He kept it because he does not like throwing identification cards out.

Sherman testified Doe was never locked in the car and could have gotten out whenever she wanted. He cooperated with police because he had "nothing to hide."

**B.** *Procedural Background: The Charges, Verdict, and Sentence*

An information filed in March 2019 charged Sherman with kidnapping to commit rape (count 1; Pen. Code,[1] § 209, subd. (b)(1)), forcible rape (count 2; § 261, subd. (a)(2)), assault with intent to commit rape (count 3; § 220, subd. (a)(1)), criminal threats (count 4; § 422, subd. (a)), assault by means of force likely to produce great bodily injury (count 5; § 245, subd. (a)(4)), false imprisonment by violence (count 6; § 236; see § 237, subd. (a)), and dissuading a witness from reporting a crime (count 7; § 136.1, subd. (b)(1)).

After the close of evidence, the court granted the People's motion to dismiss counts 3 (assault with intent to commit rape) and 6 (false imprisonment).

On March 25, 2021, the jury found Sherman not guilty of the count 1 charge of kidnapping to commit rape, but found him guilty of the lesser included offense of simple kidnapping (§ 207, subd. (a)). The jury also found Sherman guilty of assault by means of force likely to produce great bodily injury (count 5) and dissuading a witness from reporting a crime (count 7). The jury found Sherman not guilty of criminal threats (count 4) and was unable to reach a verdict on the forcible rape charge in count 2. The court later dismissed count 2 on the People's motion.

At sentencing in May 2021, the court sentenced Sherman to 11 years in prison. The court imposed the upper term of eight years for the count 1 kidnapping conviction (§ 208, subd. (a)), plus consecutive terms of one year on count 5 (assault) (§ 245, subd. (a)(4)) (one-third the midterm) and two years

_____

[1] Undesignated statutory references are to the Penal Code.

7

on count 7 (dissuading a witness) (§§ 18, 136.1, subd. (b), 1170.15) (a full middle term as authorized for certain dissuasion convictions).

Sherman appealed.

## II. DISCUSSION

### A. *Sufficiency of the Evidence To Support the Count 7 Conviction for Dissuading a Victim or Witness Under Section 136.1, Subdivision (b)(1)*

#### 1. Additional Background

At the close of the prosecution's case-in-chief, Sherman's counsel made a "[g]eneric" motion for a judgment of acquittal as to all charges pursuant to section 1118.1. As to the charge of dissuading a victim or witness in count 7, the prosecutor stated the charge was based on the evidence that Sherman prevented Doe from obtaining her phone when she asked for it, and when she did retrieve the phone, he took it from her and turned it off.[2] The trial court denied Sherman's motion.

#### 2. Standard of Review

"In ruling on a motion for judgment of acquittal pursuant to section 1118.1, a trial court applies the same standard an appellate court applies in reviewing the sufficiency of the evidence to support a conviction, that is, ' "whether from the evidence, including all reasonable inferences to be

---

[2] As reflected in a later colloquy about jury instructions, the prosecutor had by then elected to base count 7 solely on the latter act, i.e., Sherman's "alleged taking of the phone from the victim during the actual alleged assault." In closing argument, the prosecutor argued count 7 occurred when Sherman took Doe's phone during the assault. And when the jury asked for clarification as to which act or acts formed the basis for count 7, the court responded the charge was based on "the defendant's alleged taking of Fernanda Doe's cell phone during the alleged assault" when Sherman first stopped the car.

We also note the prosecutor elected to base the count 1 kidnapping charge solely on Sherman's driving *after* he assaulted her.

8

drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." [Citations.]' [Citation.] 'Where the section 1118.1 motion is made at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1212–1213.) "We review independently a trial court's ruling under section 1118.1 that the evidence is sufficient to support a conviction. [Citations.] We also determine independently whether the evidence is sufficient under the federal and state constitutional due process clauses." (*Id.* at p. 1213.) We review questions of statutory interpretation de novo. (*People v. Prunty* (2015) 62 Cal.4th 59, 71.)

**3. Analysis**

Subdivision (b) of section 136.1 provides in part: "Except as provided in subdivision (c) [addressing more serious attempts to prevent or dissuade punishable as felonies], every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense . . . : [¶] (1) Making any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge." Violation of section 136.1, subdivision (b), is a wobbler, chargeable as a misdemeanor or a felony. (*People v. Reyes* (2020) 56 Cal.App.5th 972, 982 (*Reyes*).) It was charged here as a felony. "To show a defendant has violated section 136.1, subdivision (b)(1), the People must prove '(1) the defendant has attempted to prevent or dissuade a person (2) who is a victim or witness to a crime (3) from

9

making any report of his or her victimization to any peace officer or other designated officials.' "[3] (*Reyes*, at p. 982.)

The evidence outlined above supports Sherman's conviction under section 136.1, subdivision (b)(1). As he concedes, there was evidence he assaulted Doe and tried to prevent her from using her phone (which she could have used to seek help by calling the police). But he contends that, as a matter of law, his actions did not violate section 136.1, subdivision (b)(1), because his victimization of Doe had not ended when he tried to stop Doe from using her phone. Specifically, Sherman contends section 136.1, subdivision (b)(1) "applies to attempts to dissuade reports of past crimes but does not cover attempts to prevent a victim from seeking help during an ongoing crime." Sherman misreads *Reyes*, and we reject his argument as to the scope of section 136.1, subdivision (b)(1).

In *Reyes*, the defendant (Reyes) was a deputy public defender who represented Jacques Olivas (Jacques) in underlying matters. (*Reyes, supra,* 56 Cal.App.5th at pp. 975, 976.) In one of those matters, the trial court placed Jacques on probation and issued a protective order requiring him to stay 100 yards away from his mother, Evelyn Olivas (Evelyn), and to stay

---

[3] The instruction on the section 136.1, subdivision (b)(1) charge that was given to the jury at the end of Sherman's trial (CALCRIM No. 2622) stated that, to prove he was guilty, the prosecution had to prove (1) "The defendant tried to prevent or discourage Fernanda Doe from making a report that she was a victim of a crime to a peace officer or state or local law enforcement officer or prosecuting agency," (2) "Fernanda Doe was a crime victim," and (3) "The defendant knew he was trying to prevent or discourage Fernanda Doe from reporting her victimization and intended to do so." Consistent with the applicable statutory definition of " '[v]ictim' " set forth in section 136, subdivision (3), the instruction stated: "A person is a *victim* if there is reason to believe that a federal or state crime is being or has been committed or attempted against him or her."

10

away from her home. (*Id.* at pp. 976–977.) Jacques was also " 'prohibited from having any "personal, electronic, telephonic, or written contact" with Evelyn Olivas, and prohibited from having contact with Ms. Olivas "through a third party, except an attorney of record." ' " (*Id.* at p. 977.)

The district attorney later charged Reyes (Jacques's attorney) with violating two witness tampering statutes, including dissuading a victim or witness from reporting a crime under section 136.1, subdivision (b)(1). (*Reyes*, *supra*, 56 Cal.App.5th at pp. 975, 979–980.) The charges were based on preliminary hearing evidence that, after issuance of the protective order described above, Reyes contacted Evelyn, identified himself as " 'Jacques's district attorney,' " and told her that Jacques was going to be released that day, and if he was near or at her home, she should not call the police but instead should call Reyes. (*Id.* at pp. 977–978, 981.)

The preliminary hearing evidence thus was arguably focused on an alleged attempt by Reyes to dissuade Evelyn from reporting a potential *future* crime (i.e., a possible future violation of the protective order by Jacques) (*Reyes*, *supra*, 56 Cal.App.5th at p. 984 & fn. 7), although the prosecution also presented the theory that the statute applied because Jacques engaged in *ongoing* abuse of Evelyn (*id.* at p. 984, fn. 7). The superior court granted Reyes's motion to set aside the information under section 995, agreeing (as relevant here) with "the defense position that the language of [section 136.1, subdivision (b)(1)] requires that the defendant attempt to dissuade the reporting of a past crime." (*Reyes*, at p. 980.)

On the People's appeal, we affirmed the trial court's dismissal of the section 136.1, subdivision (b)(1) charge. (*Reyes*, *supra*, 56 Cal.App.5th at pp. 975, 981, 989.) In reaching the conclusion that dismissal was proper, we described the parties' competing views as to the scope of the statute, stating:

11

"The issue before us is whether section 136.1, subdivision (b)(1), should be construed to apply only to dissuasion of reports about completed crimes, as Reyes contends (and the superior court ruled), or should be construed more broadly to encompass future crimes as well, as the People contend (and the magistrate ruled)." (*Id.* at pp. 982–983; *id.* at p. 975 ["The core issue . . . is whether, to constitute dissuasion covered by the statute, the suppressed report of 'victimization' must be of a past, completed crime, as Reyes argues, or, as the People argue, may be either a past crime or an ongoing course of criminal conduct expected to continue into the future."].)

After considering the parties' arguments and the statutory text, structure and purpose, as well as relevant case law and legislative history, we concluded there were competing interpretations of the statute that stood "in relative equipoise," and we applied the rule of lenity "as a tool of last resort" to uphold the superior court's order of dismissal. (*Reyes*, *supra*, 56 Cal.App.5th at pp. 975, 989.) We stated: "If Reyes's conduct on this record is a crime under section 136.1, subdivision (b)(1), the [superior] court correctly pointed out, 'we need the Legislature to tell us.' " (*Id.* at p. 990.)

Sherman attributes a position taken by the defense in *Reyes* to the appellate panel in that case. He focuses on a passage in *Reyes* where we described one of the arguments by defendant Reyes about the statutory language. We stated: "Reyes contends the phrase 'that victimization' refers back to a discrete, individual underlying crime ('a crime') that occurred in the past. If he is correct about that, then, even if he could be said to have engaged in a course of dissuasive conduct, he did not violate section 136.1, subdivision (b)(1), if what he did was aimed at dissuading Evelyn from reporting a future or ongoing underlying crime (rather than a past one) that

12

falls outside the scope of the statutory phrase 'that victimization.' " (*Reyes, supra*, 56 Cal.App.5th at p. 986.)

Sherman contends that, because we affirmed the superior court's dismissal order pursuant to the rule of lenity, we thereby adopted the *Reyes* defendant's view that dissuading a witness from reporting any "ongoing" crime falls outside the scope of section 136.1, subdivision (b)(1). And, Sherman concludes, because he was still victimizing Doe when he attempted to prevent her from using her phone to seek help (i.e., his underlying crime was "ongoing"), his effort to do so is not proscribed by the statute.

We reject this argument. By holding the rule of lenity required dismissal on the facts of that case (again, involving an alleged attempt to dissuade the reporting of a potential future crime or a potential future recurrence of ongoing abuse) (*Reyes, supra*, 56 Cal.App.5th at p. 984 & fn. 7), we did not adopt all the defendant's specific arguments or hold that he had accurately specified the exact reach of section 136.1, subdivision (b)(1). Nor did we discuss how the statute should apply in the different situation presented here, involving an attempt to prevent a victim from calling the police to report a specific ongoing criminal incident. *Reyes* does not support Sherman's argument that section 136.1, subdivision (b)(1) cannot apply to an attempt to prevent a victim from calling the police during an ongoing crime such as an assault.

Sherman's other arguments in support of his interpretation of section 136.1, subdivision (b)(1) are not persuasive. Sherman contends an attempt to prevent a victim from contacting the police during an ongoing crime must be seen solely as an attempt to prevent the victim from "seeking help," rather than an attempt to prevent a "report" of the crime (the conduct prohibited by § 136.1, subd. (b)(1)). Specifically, he asserts that "dissuading a

13

witness or victim from *reporting* a crime is separate and distinct from preventing a victim from summoning help during an ongoing crime."

We do not agree these are mutually exclusive categories. As courts have recognized, it will often be reasonable for a jury to conclude that, by preventing a victim from contacting the police to seek help during an ongoing crime, the defendant prevented the victim from reporting her victimization. For example, in *People v. McElroy* (2005) 126 Cal.App.4th 874, 877, 881 (*McElroy*), during a domestic violence incident, the victim (Espegren) tried calling 911, and the defendant took the telephone away and hung it up. In rejecting the defendant's challenge to the sufficiency of the evidence supporting his conviction of dissuading a victim under section 136.1, subdivision (b)(1), the appellate court concluded "the jury could reasonably infer defendant knew Espegren was attempting to contact the police for assistance and that such contact would likely result in her report of defendant's actions. Thus, by preventing Espegren from calling the police, defendant knowingly and maliciously prevented Espegren from reporting her victimization of domestic violence." (*McElroy*, at pp. 881–882.) Similarly, here, the jury reasonably could conclude that Sherman, by attempting to prevent Doe from using her phone, was attempting to prevent her from reporting his criminal conduct.

Other courts have affirmed convictions of dissuading a victim or witness under section 136.1, subdivision (b)(1) where the defendant interfered with the victim's or witness's attempt to contact police during an ongoing crime. In *People v. Cook* (2021) 59 Cal.App.5th 586, 588–589, 591–592, the appellate court upheld a section 136.1, subdivision (b)(1) conviction where the defendant's mother called 911 to report an ongoing fight between the defendant and his brother, and the defendant ripped the phone

14

off the wall and threw it on the floor, which broke the phone and disconnected the call.  And in *People v. Navarro* (2013) 212 Cal.App.4th 1336, 1342–1343, 1349, the court affirmed a section 136.1, subdivision (b)(1) conviction in a domestic violence case, where the defendant " 'head-butted' " the victim and then, when she used a cordless phone to call the sheriff's department, he grabbed the phone, removed the battery, and put the phone in a closet.  Later, after going outside and firing a gunshot into the house, the *Navarro* defendant told the victim to tell the police everything was fine.  (*Navarro*, at p. 1343.)  Consistent with the conclusions reached by the appellate courts in those cases, we hold the evidence here is sufficient to support a conclusion Sherman intended to prevent Doe from making a report to the police.  (*Cook*, at pp. 590–591; *Navarro*, at p. 1349.)

In his reply brief, Sherman argues the above cases—*Cook*, *McElroy*, and *Navarro*—are distinguishable because of differences in the factual circumstances or the appellate arguments raised by the defendants in those cases.  But the analysis in those cases is consistent with our own conclusion that a defendant's attempt to prevent a victim from calling the police during a criminal incident is itself criminal conduct that is prohibited by section 136.1, subdivision (b)(1).  No less than a victim's call to the police after she has reached safety, a call while she is still in danger may provide the opportunity for (or may lead to) the reporting of the defendant's criminal conduct, and thus a jury may reasonably find that the defendant's attempt to thwart the call is an attempt to prevent the victim from reporting her

15

victimization.[4] (§ 136.1, subd. (b)(1); *McElroy, supra,* 126 Cal.App.4th at pp. 881–882.)

Sherman attempts to support his contrary view of the statute by citing *Davis v. Washington* (2006) 547 U.S. 813, but that case is inapposite. In *Davis,* the United States Supreme Court explained that the Sixth Amendment's confrontation clause bars " 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " (*Davis,* at p. 821.) The court held a victim's statements on a 911 call were not testimonial because the circumstances objectively indicated the primary purpose of the interrogation on the call was "to enable police assistance to meet an ongoing emergency." (*Id.* at p. 828; *id.* at pp. 817–818, 822, 827.) In contrast, in a companion case that was also before the court, a different victim's statements to police who arrived at her home when there was no longer an emergency in progress were testimonial because the interrogation was "part of an investigation into possibly criminal past conduct." (*Id.* at p. 829; *id.* at pp. 819–820, 830.)

*Davis* does not assist Sherman. In announcing a test for determining whether a statement is testimonial for purposes of the federal confrontation clause (*Davis v. Washington, supra,* 547 U.S. at p. 822), the *Davis* court of

---

[4] In light of our conclusion on this point, we find it unnecessary to consider whether, as the Attorney General suggests, Sherman had completed one or more of his underlying crimes when he turned off Doe's phone. And, to the extent the Attorney General suggests Sherman's *kidnapping* of Doe had already occurred by that point (because he kidnapped her when he first picked her up and "drove her away under false pretenses"), we note that argument is inconsistent with the theory on which the prosecutor tried the case, i.e., that the kidnapping occurred when Sherman drove around with Doe in the car after he had assaulted her.

course was not addressing the scope of the state statute at issue here (§ 136.1, subd. (b)(1)). More specifically, Sherman is incorrect in suggesting *Davis* stands for the proposition that a call to the police during a crime cannot be a "*report*" of that crime within the meaning of section 136.1, subdivision (b)(1). As discussed above, when a victim contacts the police during a crime to seek help, the contact likely will result in the victim's reporting the criminal conduct. (*McElroy*, *supra*, 126 Cal.App.4th at pp. 881–882.)

Sherman's brief argument based on sections 148.5 and 148.3 is also unpersuasive. Section 148.5 prohibits falsely reporting that a felony or misdemeanor has been committed (§ 148.5, subd. (a)), while section 148.3 prohibits false reports of an emergency situation (§ 148.3, subd. (a)). Sherman cites no authority suggesting these provisions addressing different crimes should inform the construction of the victim dissuasion prohibition in section 136.1. In any event, we note sections 148.5 and 148.3 both use the term "reports" to describe the conduct at issue (§§ 148.5, subd. (a), 148.3, subd. (a)), which if anything weighs against Sherman's view that a report and a call to police during an emergency fall into sharply distinct categories.

Finally, contrary to Sherman's brief suggestion, the statute does not uniformly use the past tense to describe the underlying crime the reporting of which the defendant must have sought to prevent. Although, as Sherman notes, section 136.1, subdivision (b) refers to dissuasion of a person who "has been the victim of a crime," that provision also uses the present tense in specifying it applies to dissuasion of a person who "is witness to a crime." (§ 136.1, subd. (b).)

Moreover, the applicable definition of " '[v]ictim' " does not limit its coverage to a person who was victimized in the past. (§ 136, subd. (3).)

17

Instead, it includes a person "with respect to whom there is reason to believe that any crime . . . is being or has been perpetrated or attempted to be perpetrated" (*ibid.*), a definition that, as noted, was incorporated in the instructions to the jury here. Sherman is incorrect in suggesting the statutory text requires a conclusion that a defendant who attempts to prevent a call to the police during an ongoing criminal incident cannot be convicted under section 136.1, subdivision (b)(1). For the reasons we have discussed, it will often be reasonable (and it was reasonable in this case) for a jury to conclude that a defendant's attempt to prevent a victim from calling the police during a crime that "is being" perpetrated (§ 136, subd. (3)) is an attempt to prevent the victim from reporting her victimization within the meaning of section 136.1, subdivision (b)(1).

## B. *The Upper Term Sentence for the Count 1 Kidnapping Conviction*

Sherman contends a remand for resentencing is necessary due to the enactment of Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567), which took effect on January 1, 2022, and amended the standards for imposing an upper-term sentence under section 1170, subdivision (b). The Attorney General agrees this amendment applies retroactively to Sherman but argues any error in the imposition of sentence was harmless. We conclude a remand for resentencing is necessary.

"Senate Bill 567 amended section 1170, subdivision (b), to specify that, when a sentencing court chooses a term from a statutory triad, the chosen term shall not exceed the middle term, unless the facts supporting the aggravating circumstances are (1) established by the defendant's stipulation to them, (2) proven to a jury (or to a court, if jury is waived) beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction. (Stats. 2021, ch. 731, §§ 1.3, 3(c), adding Pen. Code

18

§ 1170, subd. (b)(1)–(3), by amendment.)"  (*People v. Jones* (2022)
79 Cal.App.5th 37, 44–45.)[5]

This statutory change potentially affects Sherman's sentence.  At the
sentencing hearing in May 2021, the court, applying the pre-Senate Bill 567
version of section 1170, subdivision (b), imposed the upper term of eight years
for the count 1 kidnapping conviction.[6]  In selecting the upper term, the court
found six aggravating factors set forth in California Rules of Court,[7]
rule 4.421 applied; the court found no mitigating factors.  As to aggravating
factors, the court first considered factors relating to the crime (listed in
rule 4.421(a)) and found the crime involved a high degree of cruelty
(rule 4.421(a)(1)); the victim was particularly vulnerable (rule 4.421(a)(3)), in
part "because of her size, language barrier" and "[s]he is not from here"; and
the crime involved some planning (rule 4.421(a)(8)).

Next, as to aggravating factors relating to the defendant (set forth in
rule 4.421(b)), the court found Sherman had engaged in violent conduct that
indicates a serious danger to society (rule 4.421(b)(1)), in particular because
the court found he had committed a sexual assault (although, as the court
noted, the jury had deadlocked on the forcible rape charge in count 2).  The
court stated Sherman "has engaged in violent conduct and is a serious danger
to society, specifically to women in any community he is released into,

---

[5] A more recent amendment to section 1170—Assembly Bill No. 960
(2021–2022 Reg. Sess.) (Assembly Bill 960)—will take effect on January 1,
2023, but does not include any changes to subdivision (b) of the statute, the
provision at issue here.

[6] At the outset of the hearing, the court noted it was applying a
preponderance of the evidence standard to determine whether aggravating
factors were true.

[7] Undesignated rule references are to the California Rules of Court.

19

whether it's ours or another community.  And this goes to what I was saying earlier about in the Court's view this was a sexual assault.  Whether or not there was penetration and it was a full rape doesn't matter with respect to the jury's finding being hung on the rape charge.  There can obviously be very serious sexual assaults short of an actual rape, and so I think [rule] 4.421(b)(1) applies because of the underlying sexual assault that immediately preceded the kidnap.  I understand the kidnap, the theory, and what the jury found the defendant guilty of is the kidnap occurred after the assault."

The court continued:  "So despite the hung jury on the rape count, as I said, I do find that this was an assault.  And as I noted, even the defendant admits the sexual conduct here, so the only issue for the Court into how to interpret that sexual conduct is whether or not it was consensual, and I find that it absolutely was not.  Immediately upon getting into the defendant's car he headed away from the area.  He went to a secluded area.  He took her phone.  He made no effort to find her hotel, and that all shows that this was planned and thought out prior to the assault, in the Court's view.  Keeping the victim's various ID cards was—I don't know a word to use there— frightening, scary, sort of, trophy-collecting behavior, and I think that's relevant to potential future danger."

Finally, as additional aggravating factors relating to the defendant (rule 4.421(b)), the court noted Sherman had several prior misdemeanor convictions (rule 4.421(b)(2))[8] and had prior probation violations on the

---

[8] In their appellate briefs, both parties suggest the court did not base its prior-conviction finding on certified records of conviction (an authorized method, post-Senate Bill 567, for finding true a prior-conviction aggravating factor) (§ 1170, subd. (b)(3)); instead, the court relied on information in a probation report.

20

misdemeanors (rule 4.421(b)(5)). As to the prior convictions, the court stated: "There is six or seven, and he obviously hasn't learned anything from those because he is continuing to offend, and not only that, but it's now escalating. This is obviously exponentially more serious than his prior offenses, and as noted before, also, he has prior probation violations on the misdemeanors."

We agree with the parties that Sherman, whose convictions are not final, is entitled to retroactive application of the ameliorative changes effected by Senate Bill 567. (*People v. Jones*, *supra*, 79 Cal.App.5th at p. 45.) The parties disagree, however, as to whether a remand for resentencing is necessary. Specifically, the Attorney General argues any error in the trial court's imposition of the upper term under pre-Senate Bill 567 standards is harmless, while Sherman contends the error is prejudicial and requires reversal and remand. We agree with Sherman that a remand for resentencing is necessary.

The Courts of Appeal are divided on the applicable standard for assessing prejudice in this situation, and the issue is pending before our Supreme Court.[9] (*People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted Aug. 10, 2022, S274942.) The primary disagreement is between *People v. Flores* (2022) 75 Cal.App.5th 495, a decision by Division Three of this court, and *People v. Lopez* (2022) 78 Cal.App.5th 459, a decision by Division One of the Fourth District Court of Appeal. *Flores* concluded a remand for resentencing is unnecessary if the reviewing court can determine beyond a reasonable doubt that the jury would have found true at least one aggravating factor (*Flores*, at pp. 500–501), and *Lopez* concluded a remand is

---

[9] We reject Sherman's contention in his reply brief that the error here is not subject to harmless error analysis (a view that has not been adopted by any of the Courts of Appeal).

21

necessary unless the reviewing court can (1) determine beyond a reasonable doubt that the jury would have found true all the aggravating factors the trial court cited, or (2) conclude, "to the degree required by *People v. Watson* (1956) 46 Cal.2d 818, 836," that the trial court would have reached the same decision even if it knew it could not properly rely on all the factors it did (*Lopez*, at p. 467, fn. 11).

Division Two of this court has agreed with *Lopez* (*People v. Wandrey* (2022) 80 Cal.App.5th 962, 982, review granted Sept. 28, 2022, S275942), and Division Six of the Second District Court of Appeal has agreed with *Flores* (*People v. Salazar* (2022) 80 Cal.App.5th 453, 465, 458, 462, review granted Oct. 12, 2022, S275788). The Third District Court of Appeal and Fifth District Court of Appeal have articulated other standards. The Third District essentially agreed with *Lopez*, stating that "[its] approach and the *Lopez* court's approach are the same in terms of outcomes," but described the standard differently. (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1113.) The Fifth District concluded that since the type of error at issue has both federal Constitutional and state law dimensions, "the correct standard for harmless error lies between the standards articulated in *Flores* and *Lopez*," a standard we discuss below. (*People v. Dunn* (2022) 81 Cal.App.5th 394, 408–409 (*Dunn*), review granted Oct. 12, 2022, S275655.)

We agree with the majority of courts to address the issue that, contrary to *Flores*, "a reviewing court finding beyond a reasonable doubt that the jury would have found a single aggravating factor true beyond a reasonable doubt is insufficient to conclude that the error was harmless." (*Dunn*, *supra*, 81 Cal.App.5th at p. 408.) We need not decide which of the remaining potential standards for assessing prejudice is correct, however, because even

22

applying the *Dunn* standard—the most favorable to the People other than the *Flores* standard—a remand is required.

Dunn described the standard for assessing prejudice as follows: "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is [no] reasonable probability that the jury would [not] have found any remaining aggravating circumstance(s) true beyond a reasonable doubt.[10] If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing . . . ." (*Dunn, supra*, 81 Cal.App.5th at pp. 409–410, fn. omitted.)

Applying this standard here, we conclude a remand is required. At least three of the aggravating factors found true by the court—that the crime involved a "high degree of cruelty" (rule 4.421(a)(1)), that Doe was

_____

[10] In the original, *Dunn* describes the "(1)(b)" part of the standard as "whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt," but later describes it as whether there is "a reasonable likelihood the jury would not have found the . . . aggravating circumstance true beyond a reasonable doubt." (*Dunn, supra*, 81 Cal.App.5th at pp. 410–411.) The latter formulation is correct, as the question under *Watson* is whether there is a reasonable probability of a result more favorable to the defendant, not whether there is a reasonable probability that the same, unfavorable result would be reached again. (See *People v. Watson, supra*, 46 Cal.2d at p. 836.)

23

"particularly vulnerable" (rule 4.421(a)(3)), and that Sherman poses a "serious danger to society" (rule 4.421(b)(1))—involve subjective, qualitative determinations. We cannot conclude with confidence that the jury would have reached the same conclusions on these points as the trial court did. (See *People v. Sandoval* (2007) 41 Cal.4th 825, 840, 837 ["to the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court"].) In our view, there is a reasonable probability the jury would not have found these aggravating factors true beyond a reasonable doubt.

In particular, as noted, in concluding Sherman poses a serious danger to society, the court relied in significant part on its finding that Sherman sexually assaulted Doe, explaining that, although the jury deadlocked on the forcible rape charge, there can be "very serious sexual assaults short of an actual rape." We of course agree with the trial court that a very serious sexual assault may occur even if all elements needed for a rape conviction are not established. But in the present case, in light of the jurors' inability to reach a verdict on the rape charge, we conclude there is a reasonable probability they would not have found beyond a reasonable doubt that Sherman sexually assaulted Doe, a primary basis for the court's finding that Sherman poses a serious danger to society.

Because we cannot conclude with sufficient certainty that some of the aggravating factors on which the trial court relied (that the crime involved a high degree of cruelty, that Doe was particularly vulnerable, and that Sherman poses a serious danger to society) would have been found true if submitted to the jury, we proceed to the second step of the prejudice analysis.

24

(See *Dunn*, *supra*, 81 Cal.App.5th at p. 410.) The court appeared to give significant weight to these factors, particularly its conclusion Sherman poses a serious danger to society. In these circumstances, we believe "there is a reasonable probability that the . . . court would have imposed a sentence other than the upper term" if it had realized it could not rely on these factors. (*Ibid.*) A remand for resentencing is therefore required.

We agree with the Attorney General that, on remand, the People should have the option to proceed under the amended version of section 1170, subdivision (b), which would permit them to seek to prove aggravating factors to a jury beyond a reasonable doubt (or to the court if Sherman waives the right to a jury). (*People v. Lopez, supra*, 78 Cal.App.5th at p. 468.) Alternatively, the People "may accept resentencing on the record as it stands." (*Ibid.*)

## III. DISPOSITION

Sherman's convictions are affirmed. His sentence is vacated, and the case is remanded for resentencing. On remand, with respect to count 1, the People may elect to proceed by meeting the requirements of the amended version of section 1170, subdivision (b), or alternatively, to have the court resentence Sherman on the record as it stands. After the People make this election, and after the court conducts any further proceedings that may be necessary, the trial court is directed to resentence Sherman consistent with current applicable sentencing laws.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
GOLDMAN, J.

25

Trial Court: Superior Court of California, County of San Mateo

Trial Judge: Hon. Jeffrey R. Finigan

Counsel: Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Arlene A. Sevidal, Supervising Deputy Attorney General, Randal D. Einhorn and Andrew Mestman, Deputy Attorneys General for Plaintiff and Respondent.